ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON (167268)
DEBRA J. WYMAN (190812)
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
debraw@rgrdlaw.com
bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD A. BERG, Individually and on Behalf of All Others Similarly Situated,<br><br>                           Plaintiff,<br><br>        vs.<br><br>VELOCITY FINANCIAL, INC., CHRISTOPHER D. FARRAR, MARK R. SZCZEPANIAK, CHRISTOPHER J. OLTMANN, ALAN H. MANTEL, IAN K. SNOW, JOHN A. PLESS, BRANDON KISS, OGDEN PHIPPS, DANIEL J. BALLEN, JOHN P. PITSTICK, JOY L. SCHAEFER, SNOW PHIPPS GROUP, LLC, WELLS FARGO SECURITIES, LLC, CITIGROUP GLOBAL MARKETS INC., JMP SECURITIES LLC and RAYMOND JAMES & ASSOCIATES, INC.,<br><br>                           Defendants. | Case No. 2:20-cv-06780-RGK-PLA<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

4831-6467-7072.v8

Lead Plaintiff Edward A. Berg, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Lead Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through counsel, which included, among other things, a review of the public U.S. Securities and Exchange Commission ("SEC") filings of Velocity Financial, Inc. f/k/a Velocity Financial, LLC ("Velocity" or the "Company"), press releases, analyst and media reports, and other public reports and information regarding the Company.  Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## I.      JURISDICTION AND VENUE

1.      The claims alleged herein arise under §§11 and 15 of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§77k and 77o.  This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act.

2.      This Court has personal jurisdiction over each of the Defendants (as defined below) and venue is proper in this County.  Velocity is headquartered in this District and Defendants drafted the Registration Statement and Prospectus issued in connection with Velocity's initial public offering ("IPO") in part here, disseminated the misleading statements at issue here, and solicited stock purchasers here.  The Underwriter Defendants (as defined below) also have substantial operations and/or

4831-6467-7072.v8

conduct substantial business in California (directly or via agents), and represented Velocity and all or some of the other defendants in carrying out the IPO.

## II.    NATURE OF THE ACTION

3.      This is a securities class action on behalf of all purchasers of Velocity common stock pursuant and/or traceable to the Registration Statement and Prospectus, as amended, issued in connection with Velocity's January 2020 IPO (the "Offering Materials"), seeking to pursue remedies under the 1933 Act against Velocity, certain of its officers and directors, Velocity's private equity sponsor and controlling shareholder, and the underwriters of the IPO.

4.      Velocity is a real estate finance company headquartered in Westlake Village, California, that originates and manages loans issued to borrowers nationwide to finance the purchase of small residential rental and commercial real estate investment properties.  It also securitizes and sells some loans and holds others for investment purposes.  As of the IPO, most of the Company's non-performing loans were geographically concentrated in California, New York, Florida, and New Jersey.

5.      Defendants failed to disclose that at the time of the IPO the Company's non-performing loans had dramatically increased in size from the figures provided in the Offering Materials, as measured by both the amount of unpaid principal balance and as a percentage of the Company's overall loan portfolio.  In fact, the rate of non-performing loans was ***at least 20% higher*** than represented in the Offering Materials. And only after the IPO did Defendants disclose that the percentage of non-performing

- 2 -

loans in the second quarter of 2019 ("2Q19") was ***understated*** in the Offering Materials by almost 8%.  The increased rate of non-performing loans was a direct result of the undisclosed relaxation of Velocity's underwriting practices which fueled massive growth in the Company's loan portfolio but filled it with risky loans more likely to become delinquent and fall into non-performing status.

6.      Defendants also failed to disclose the potential impact of a brewing pandemic on Velocity's business and operations, despite the fact that the international spread of the novel coronavirus had already been confirmed at the time of the IPO. Instead, the Offering Materials contained generic warnings that market turmoil could eventually erupt and affect Velocity's business and told investors that Velocity "operate[s] in a large and highly fragmented market with substantial demand for financing and limited supply of institutional financing alternatives."

7.      In fact, the Offering Materials depicted a halcyon real estate market and represented that the Company "ha[d] developed the highly-specialized skill set required to effectively compete in this market," which supposedly "afforded [it] a durable business model capable of generating attractive risk-adjusted returns for [its] stockholders throughout various business cycles."  But this portrayal was materially misleading, because an increasing proportion of Velocity's loans had entered non-accrual status (meaning that they were at least 90 days past due) or were delinquent and approaching non-accrual status, and the Company was not uniquely well-positioned to weather the brewing storm.  At the time of the IPO, the unpaid principal

- 3 -

amount of non-performing loans held on the Company's balance sheet had nearly **doubled** year over year, and was accelerating rapidly.  In addition, the purported demand for Velocity's loan originations was temporary and short-lived, as borrowers took advantage of declining interest rates as the coronavirus continued to spread.  Indeed, the U.S. regions where Velocity had historically originated, and continued to originate, most of its loans were among the most vulnerable to – and ultimately the hardest hit by – the virus.

8.     The failure to disclose the substantial and growing proportion of the Company's loans that were non-performing and/or on non-accrual status as of the IPO rendered the statements contained in the Offering Materials regarding the quality of the Company's loan portfolio and underwriting practices materially misleading.  Moreover, the failure to disclose information concerning the onset of the coronavirus pandemic, or its actual and potential implications for the Company's operational and financial condition and prospects, rendered the Offering Materials' positive descriptions of the market, demand for investor loans for commercial real estate, and the Company's business materially incomplete and misleading.  These developments, risks, and uncertainties, which existed at the time of the IPO but were not disclosed to investors in connection with the IPO, had a material adverse effect on Velocity's business, operations, and financial results.

9.     By May 18, 2020, after the Company belatedly made these disclosures to investors, Velocity stock closed at just $2.50 per share – more than **80% below** the

- 4 -

price investors paid for the stock in the IPO just four months previously.  This action seeks to recover damages for Velocity investors.

## III.   PARTIES

10.   Lead Plaintiff Edward A. Berg purchased Velocity common stock pursuant and/or traceable to the Offering Materials, as set forth in the Certification previously filed (ECF No. 1) and incorporated herein, and has been damaged thereby.

11.   Defendant Velocity Financial, Inc. is a real estate finance company headquartered in California that primarily originates and manages loans secured by one-to-four unit residential retail and small commercial properties.  Before the IPO, Velocity was a limited liability company known as Velocity Financial, LLC. Immediately before completing the IPO, Velocity converted into a corporation with the same senior executives and several of the same directors, as well as two directors identified in the Offering Materials as director nominees.  Velocity operates its business through subsidiaries and other associated entities, including Velocity Commercial Capital, LLC, which does business as Velocity Mortgage Capital.

12.   Defendant Christopher D. Farrar was Velocity's Chief Executive Officer at the time of the IPO and became a director of the Company in connection with the IPO.

13.   Defendant Mark R. Szczepaniak ("Szczepaniak") was Velocity's Chief Financial Officer at the time of the IPO.

14.     Defendant Christopher J. Oltmann was Velocity's Chief Accounting Officer at the time of the IPO.

15.     Defendant Alan H. Mantel was a member of Velocity's pre-IPO Board of Managers.   He was also a Partner at defendant Snow Phipps (as defined below).  Immediately before the IPO closed, he became Chairman of the Board of Directors (the "Board") when Velocity converted from a limited liability company to a corporation.

16.     Defendant Ian K. Snow was a member of Velocity's pre-IPO Board of Managers.   He was also a co-founding Partner at defendant Snow Phipps and the managing member of the General Partner of the affiliated Snow Phipps funds that held its Velocity investment.

17.     Defendant John A. Pless was a member of Velocity's pre-IPO Board of Managers.  He was also a Partner at defendant Snow Phipps.  Immediately before the IPO closed, he became a member of the Board when Velocity converted from a limited liability company to a corporation.

18.     Defendant Brandon Kiss was a member of Velocity's pre-IPO Board of Managers.  He was also a Managing Director at defendant Snow Phipps.

19.     Defendant Ogden Phipps was a member of Velocity's pre-IPO Board of Managers.  He was also a co-founding Partner at defendant Snow Phipps.

- 6 -

4831-6467-7072.v8

20.    Defendant Daniel J. Ballen was a member of Velocity's pre-IPO Board of Managers.  Immediately before the IPO closed, he became a member of the Board when Velocity converted from a limited liability company to a corporation.

21.    Defendant John P. Pitstick ("Pitstick") was identified in the Offering Materials as a person who would become a member of the Board when Velocity converted from a limited liability company to a corporation.  He consented to be named in the Offering Materials as a person about to become a director.

22.    Defendant Joy L. Schaefer ("Schaefer") was identified in the Offering Materials as a person who would become a member of the Board when Velocity converted from a limited liability company to a corporation.  She also previously served as an Operating Partner at defendant Snow Phipps.  She consented to be named in the Offering Materials as a person about to become a director.

23.    The defendants identified in ¶¶12-22 above are referred to herein as the "Individual Defendants."  All of the Individual Defendants, other than defendants Pitstick and Schaefer (who were named as incoming directors) signed the Registration Statement for the IPO.  Each of the Individual Defendants also reviewed and helped prepare the Offering Materials and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's common stock to investors in the IPO for their own financial benefit and the financial benefit of Velocity.

4831-6467-7072.v8

24.     Defendant Snow Phipps Group, LLC ("Snow Phipps") is a private equity firm that specializes in mid-market control investments and takes an active role in managing its investments.  Defendant Snow Phipps sponsored the IPO and was the controlling shareholder of Velocity immediately prior to the IPO, beneficially owning more than 60% of the Company's shares through affiliated funds.  Defendant Snow Phipps continued to be the Company's largest shareholder after the IPO.  Defendant Snow Phipps also cemented its control over the Company through various shareholder agreements and was entitled to nominate two directors to Velocity's Board.  As acknowledged in the Offering Materials, "the degree of control on our board of directors held by Snow Phipps . . . may be greater than their proportionate ownership of our common stock."

25.     Defendants Wells Fargo Securities, LLC, Citigroup Global Markets Inc., JMP Securities, LLC, and Raymond James & Associates, Inc. (the "Underwriter Defendants") served as underwriters for the IPO.  Collectively, they sold more than 8.3 million Velocity shares in the IPO at $13 per share and shared over $7.5 million in underwriting discounts and commissions.  Their failure to conduct adequate due diligence in connection with the IPO and the preparation of the Offering Materials was a substantial factor leading to the harm complained of herein.

26.     Velocity, the Individual Defendants, Snow Phipps, and the Underwriter Defendants are collectively referred to herein as "Defendants."

- 8 -

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Velocity's Business

27.    Based in Westlake Village, California, Velocity is a real estate finance company that issues, manages, and securitizes loans used by borrowers to finance the purchase of investment properties – primarily single-family rental homes with one-to-four unit residential investments and small commercial properties.  It originates loans nationwide across a network of 3,000 independent mortgage brokers that refer borrowers who require financing to Velocity.

28.    As a real estate lender that lends to higher-risk borrowers, Velocity's underwriting guidelines and practices are of the utmost importance to its business and financial performance.  The Company portrayed itself to investors as a disciplined lender in the underserved niche market of small commercial properties and residential rental units.  Many established real estate lenders focus on financing large real estate purchases because of the risks and complexities associated with lending to individual investors and small businesses.  As a result, they normally have fewer non-performing loans than Velocity.  However, Velocity assured prospective shareholders that it implemented a hands-on, data-driven approach to provide effective due diligence in its underwriting processes, weed out potentially troublesome borrowers, and construct a high-quality loan portfolio to maximize potential yields.  As reported in the Offering Materials, Velocity's portfolio contained an average loan balance of only $323,000 as of September 30, 2019.

4831-6467-7072.v8

29.    The Company's primary product is a 30-year amortizing term loan with a three-year fixed-rate period, which floats at a spread to the prime rate thereafter (subject to a floor equal to the starting fixed rate), used to finance long-term real estate investments.  Borrowers use this product to finance stabilized long-term real estate investments.  In March 2017, the Company began originating short-term interest-only loans used for acquiring, repositioning, or improving the quality of one-to-four unit residential investment properties.  This product is an interim solution for borrowers and/or properties that do not meet the investment criteria of the Company's primary 30-year product.

30.    In the lead up to the IPO, the Company rapidly expanded its loan portfolio.  As of September 30, 2019, the Company claimed to have a total net loan portfolio worth $1.9 billion, an increase of $300 million over the preceding nine months and an increase of 90% over the Company's loan portfolio as of December 31, 2016.  This increased portfolio value generated for the Company $113 million in interest income for the nine months ended September 30, 2019, with a healthy 8.82% portfolio yield.  Importantly, the Offering Materials reported that Velocity had grown its loan portfolio while also consistently increasing its portfolio yield every year since 2016 – critical financial attributes to Velocity's investors.  Furthermore, the Offering Materials also represented that Velocity's non-performing loans had an unpaid principal balance of only $118 million, or just 6.13% of the Company's overall portfolio.  Velocity's ability to continue to grow its loan portfolio and generate

- 10 -

profitable, performing loans was critical to its future business and prospects, and an important attribute to investors.

31.    The following charts adapted from the Offering Materials show the geographic dispersion and original amount of loans held for investment and sale as of September 30, 2019:

**Loans Held For Investment**
**As of September 30, 2019**

**Loans Held For Sale**
**As of September 30, 2019**





32.    Velocity also holds loans in its investment portfolio and securitizes and sells those loans.  The Offering Materials reported that as of September 30, 2019, one-to-four unit residential rental loans comprised 46.8% of the Company's "held for" investment loan portfolio, with mixed-use and multi-family properties representing

- 11 -

13.7% and 11.1%, respectively (and no other category exceeding 10%).   By geography, the principal balance of Velocity's loans held for investment were concentrated 23.6% in New York, 22.2% in California, 12.3% in Florida, and 8.2% in New Jersey.

33.     By contrast, Velocity has historically aggregated and sold to institutional investors its short-term interest-only loans.  During the nine months ended September 30, 2019 and September 30, 2018, the Company originated $215.6 million and $89.4 million of loans held for sale and sold $114.0 million and $28.1 million of loans held for sale, respectively.  The Offering Materials stated that the Company was evaluating long-term financing alternatives for such loans and might retain such loans in the future to earn a longer term spread.

**B.     Velocity's IPO**

34.     Velocity filed its Registration Statement on Form S-1 with the SEC on October 18, 2019.  Following several amendments, the Registration Statement was declared effective by the SEC on January 16, 2020.  On January 17, 2020, the Company filed its final Prospectus, dated January 16, 2020 (which incorporated and formed part of the final Registration Statement), with the SEC.

35.     Together, the Offering Materials were used to sell over 8.3 million shares of Velocity common stock to the investing public (including the full exercise of the Underwriter Defendants' over-allotment option) at a price of $13 per share, generating over $108 million in gross offering proceeds.

4831-6467-7072.v8

**V.     THE FALSE AND MATERIALLY MISLEADING OFFERING MATERIALS**

36.     The Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing their preparation.

**A.     Misstatements Regarding Velocity's Underwriting Practices**

37.     The Offering Materials highlighted the Company's purportedly "disciplined" underwriting policies and practices, which Defendants claimed "differentiated" Velocity's business from its competitors.  They listed Velocity's "Customized Technology and Proprietary Data Analytics," which purportedly positioned Velocity "for sustainable, long-term growth" at the time of the IPO, as one of the Company's key "Competitive Advantages."  The Offering Materials continued in pertinent part:

> *Our underwriting approach focuses on generating attractive returns while minimizing credit losses and is enhanced by automation through the extensive use of customized systems to power automation and drive our use of data analytics.  We apply the same disciplined due diligence and underwriting process to all loans we review, regardless of whether they are originated or acquired*.  Our asset-driven underwriting philosophy encompasses property level due diligence, including lease and rent reviews, local market liquidity and trend assessment and a

- 13 -

4831-6467-7072.v8

rigorous valuation process.  In addition, we perform individual borrower diligence, including credit review, evaluation of experience and asset verification.  ***We believe our extensive access to proprietary data gives us a differentiated perspective and underwriting ability***.[1]

38.     In reality, Velocity's underwriting process was deficient.     The Company's business centers on issuing loans to higher-risk borrowers that do not qualify for traditional bank loans.  As a result, Velocity's percentage of loans that are non-performing ***normally*** runs higher than that of other lenders.  It was misleading to extol Velocity's underwriting practices in the Offering Materials but fail to disclose that those same practices were allowing riskier loans than the Company had historically issued to be made, resulting in a higher, and growing, percentage of non-performing loans in Velocity's portfolio.

**B.     Misstatements Regarding Velocity's Growth and Non-Performing Loans**

39.     The Offering Materials also emphasized the growth of the Company's loan portfolio in the lead-up to the IPO and the consistent increase in the Company's portfolio yield.  The following chart of Velocity's "Key Performance Metrics" was provided in the Offering Materials:

---

[1]     Emphasis has been added unless otherwise noted.

| Key Performance Metrics | Nine Months Ended September 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2018 | 2017 | 2016 |
| | ($ in thousands) | | | | |
| Average loans(1) | $1,715,172 | $1,387,535 | $1,429,877 | $1,167,999 | $944,437 |
| Portfolio yield(2) | 8.82% | 8.76% | 8.72% | 8.38% | 8.30% |
| Average debt — portfolio related(3) | $1,529,009 | $1,192,289 | $1,234,818 | $ 965,987 | $802,683 |
| Average debt — total company(4) | $1,660,837 | $1,319,883 | $1,362,412 | $1,090,532 | $914,467 |
| Cost of funds — portfolio related(5) | 5.34% | 5.01% | 5.07% | 4.93% | 4.66% |
| Cost of funds — total company(6) | 5.76% | 5.53% | 5.57% | 5.62% | 5.56% |
| Net interest margin — portfolio related(7) | 4.06% | 4.46% | 4.34% | 4.30% | 4.34% |
| Net interest margin — total company(8) | 3.24% | 3.50% | 3.41% | 3.13% | 2.92% |
| Charge-offs(9) | 0.03% | 0.03% | 0.03% | 0.09% | 0.13% |
| Pre-tax return on equity(10)(11) | 15.8% | 15.8% | 14.3% | 10.8% | 9.9% |
| Return on equity(11) | 11.1% | 8.6% | 7.8% | 10.8% | 9.9% |

(Footnotes omitted.)

40.    The Offering Materials also stated that Velocity's total loan portfolio had continued to increase in the fourth quarter of 2019 ("4Q19") – the quarter immediately prior to the IPO – and that, despite the Company's rapid growth in loan originations, its non-performing loans as a proportion of total loans had remained within a moderate range during 4Q19 with a midpoint of just 6.7%.  The Offering Materials stated in pertinent part:

*Estimates for the Year Ended December 31, 2019*

*We expect to report total loan originations of at least $1,009.0 million for the year ended December 31, 2019,* compared to total loan originations of $737.3 million for the year ended December 31, 2018, and $554.7 million for the year ended December 31, 2017.

*We expect to report total loans, as measured by unpaid principal balance, of at least $2,055.0 million as of December 31, 2019,*

- 15 -

compared to total loans, as measured by unpaid principal balance, of $1,928.2 million as of September 30, 2019, and $1,631.3 million as of December 31, 2018. ***We expect to report non-performing loans between 6.50% and 6.90% of total loans, as measured by unpaid principal balance, as of December 31, 2019***, compared to non-performing loans of 6.13% as of September 30, 2019, and of 5.85% as of December 31, 2018. Non-performing loans includes all loans that are 90 or more days past due, in bankruptcy or in foreclosure.

***We expect to report net income between $16.8 million and $18.6 million for the year ended December 31, 2019***, compared to net income of $10.5 million for the year ended December 31, 2018, and $14.0 million for the year ended December 31, 2017.

41.     The statements in ¶¶39-40 above were materially false and misleading because, as of the date of the IPO, a significantly higher proportion of Velocity's total loan portfolio had become non-performing, and this trend was accelerating. The Company reported non-performing loans as represented in the chart below:

1
2
3
4
5
6
7
8
9
10



11    42.    But the Offering Materials omitted to report that the unpaid principal

12  amount of non-performing loans had approximately ***doubled*** year over year and

13  ***was accelerating at the time of the IPO***, as represented in the charts below:

14
15
16
17
18
19
20
21
22
23
24



25
26
27
28





43.     Notably, the Offering Materials grossly underrepresented the percentage of non-performing loans in 2Q19.  The percentage of total non-performing loans in 2Q19 represented in the Offering Materials was 5.96%.  However, the true percentage of total non-performing loans in 2Q19 was 6.41%.  Moreover, the percentage of non-performing loans held for investment in 2Q19 represented in the Offering Materials

4831-6467-7072.v8

was 5.60%, while the true percentage of non-performing loans held for investment in 2Q19 was actually 6.0%. The disparity is represented in the chart below:



44.    Non-accrual occurs after 90 days of delinquency, meaning that the high proportion of non-accrual loans acknowledged after the IPO *had already entered delinquency as of the IPO*. The level of delinquency being experienced as a result of the Company's relaxed underwriting processes negatively impacted Velocity's overall loan portfolio – its most critical asset – jeopardizing the financial health of the Company.

45.    While the Company highlighted its rapid loan origination growth in the Offering Materials, Velocity failed to disclose the true extent of loans held that were delinquent but fewer than 90 days past due. The following chart represents loans held for investment that had, unbeknownst to investors, entered delinquency but had not yet become non-performing because they were fewer than 90 days past due:

4831-6467-7072.v8





46.    These undisclosed, adverse trends were the result of Velocity's rapid growth in its loan portfolio prior to the IPO, fueled by deficiencies in the Company's underwriting practices and procedures that existed at the time of the IPO.  Investors were not given truthful information to enable them to access the health of Velocity's loan portfolio – a critical asset to the Company's financial performance.

47.    The Company also failed to disclose that the rapid loan origination growth was driven mainly by origination of short-term, interest-only loans with lower average FICO scores – loans that are more likely to become delinquent than the fully-amortizing loans.  The Company's April 8, 2020 press release discussing Velocity's 4Q19 results (the quarter just **prior** to the IPO) reported that "[l]oan origination volume growth was primarily driven by a 103 percent year-over-year growth in short-term loans.  These loans typically serve as an interim solution for borrowers and/or

- 20 -

properties that do not meet the investment criteria of [Velocity's] primary 30-year product."  The Offering Materials misleadingly touted the Company's growth but failed to disclose that the growth was driven by the relaxation if its underwriting process, permitting an increase in the origination of loans that were more likely to become non-performing.

### C. Misstatements Regarding Market Conditions and Velocity's Ability to Capitalize on Them

48.    The Offering Materials favorably described the Company's market as of the IPO, stating that Velocity "operate[s] in a large and highly fragmented market with substantial demand for financing and limited supply of institutional financing alternatives."  Defendants also represented that the Company "ha[d] developed the highly-specialized skill set required to effectively compete in this market," claiming the Company had "a durable business model capable of generating attractive risk-adjusted returns for [its] stockholders throughout various business cycles."

49.    Under the heading "Our Market Opportunity," the Offering Materials also favorably portrayed the market conditions facing the Company and Velocity's unique ability to capitalize on these market conditions, stating in pertinent part:

> We believe that there is a substantial and durable market opportunity for investor real estate loans across 1-4 unit residential rental and small commercial properties, and that our institutionalized approach to serving these fragmented market segments underpins our long-term business strategy.  Our growth to date has validated the need for scaled

- 21 -

lenders with dedication to individual investors who own ten or fewer properties, a base which we believe represents the vast majority of activity across our core market.

50.     The Offering Materials relied in substantial part on outdated information in describing the condition of the residential and commercial real estate markets and industry demand.  In a section entitled "1-4 Unit Residential Rental Properties," for example, the Offering Materials presented "statistical and economic market data and industry forecasts and projections" derived from a market study, prepared in connection with the IPO, based on data available as of September 2019.  Likewise, in a section entitled "Small Commercial Properties," the Offering Materials presented information of a similar type also derived from a market study, prepared in connection with the IPO, based on data available as of September 2019.

51.     By the effective date of the Offering Materials, however, the coronavirus was already quickly spreading around the world and invading the United States, threatening to disrupt the locations where Velocity maintained offices and had originated most of its loans.  It was misleading for the Offering Materials to describe a robust market and strong demand for real estate investor loans when those conditions were not realistic given the evolving circumstances arising from a new and quickly-spreading disease.  The brewing pandemic presented uncertainties and risks that rendered misleading the Offering Materials' representations of a healthy market and company that was uniquely well-positioned to capitalize on it.

- 22 -

4831-6467-7072.v8

52.     Instead, the Offering Materials contained generic risk warnings, applicable to any company operating in the real estate industry, that "conditions that negatively impact this market may reduce demand for our loans and may adversely impact our business, results of operations and financial condition" and, further, that "difficult conditions in the real estate markets, the financial markets and the economy generally may adversely impact our business results of operations and financial condition." This language did not adequately warn purchasers of common stock in connection with the IPO of the issues Velocity was then facing as a result of the coronavirus.

**D.     Failure to Disclose Information Required by Items 303 and 105 of Regulation S-K**

53.     By not disclosing the known trends, uncertainties, and risks detailed above, Defendants also violated their disclosure obligations under Items 303 and 105 of SEC Regulation S-K.

54.     Item 303 of SEC Regulation S-K requires issuers to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In May 1989, the SEC issued an interpretive release ("Interpretive Release") stating in pertinent part that:

Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the

- 23 -

4831-6467-7072.v8

registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

\*      \*      \*

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

55.    The Interpretive Release also provides that Item 303 requires "[d]isclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations." It also highlights that the Registration Statement "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

56.    Velocity's failure to disclose in the Offering Materials that (i) its underwriting practices had been relaxed, allowing for riskier loans to be made and thus subjecting the Company to greater losses from non-performing loans; (ii) its loan portfolio growth was driven primarily by an increase in the origination of riskier, short-term loans with a higher chance of becoming delinquent; (iii) the Company was experiencing a significantly higher percentage of non-performing loans as the newly-issued loans seasoned; and (iv) a brewing pandemic presented uncertainty that was

- 24 -

likely to adversely affect the economy and real estate market, violated Item 303.  The undisclosed trends and uncertainties were known to Defendants at the time of the IPO, were quickly worsening at the time of the IPO, and did in fact have an adverse effect on the Company's business and financial results, yet Defendants failed to disclose them to investors until after the IPO.

57.     Item 105 of Regulation S-K requires that the most significant factors that make the investment speculative or risky be included in the "Risk Factors" section of the Registration Statement.  Item 105 also requires that each risk factor adequately describe the risk.  Because Defendants failed to disclose the omitted material facts alleged in ¶¶37-52, above, Defendants violated Item 105 of Regulation S-K.

58.     Further, the "Risk Factors" that Velocity did report were themselves materially misleading because they presented as hypothetical, risks that had already materially harmed the Company.  For example, the Company provided in the Offering Materials that "[o]ur underwriting guidelines in the mortgage loan origination process *may* result in increased delinquencies and defaults."  In reality, the underwriting guidelines had ***already*** resulted in increased delinquencies and defaults, with the upward trend in non-performing loans materially accelerating at the time of the IPO, as described in ¶¶39-47 above.

59.     Velocity also warned that "[o]ur inability to manage future growth effectively ***could*** have an adverse impact on our business, results of operations and financial condition."  But, the Company's inability to manage growth effectively was

- 25 -

*already* adversely impacting Velocity's business at the time of the IPO.  While the Company was rapidly growing by originating new loans, it was doing so by originating riskier short-term loans that were more likely to become delinquent than the Company's longer-term loans.   As the newly originated loans seasoned, delinquency and non-performing loans increased substantially, with the upward trend accelerating at the time of the IPO, as described in ¶¶39-47.

### E.   Events Following the IPO

60.   On March 31, 2020, Velocity stated that it would delay the filing of its 2019 annual report "due to the current economic environment, including circumstances related to the novel coronavirus (COVID-19) global outbreak."

61.   On April 6, 2020, Velocity announced that it had sold $45 million in preferred stock and warrants to its two largest shareholders, including defendant Snow Phipps, and amended the terms of its warehouse facilities in order to improve the Company's balance sheet and liquidity profile, citing coronavirus as a factor that could materially and adversely affect its financial results.

62.   On April 7, 2020, Velocity filed its 2019 annual report on Form 10-K, which belatedly provided extensive risk warnings and disclosures relating to the coronavirus, including a description of uncertainties facing the business.  These risks should have been provided to investors in the Offering Materials but were not.

63.   On April 8, 2020, Velocity issued a release providing the Company's financial and operational results for 4Q19 and full year 2019 – the quarter and year-

end *immediately before* the IPO.  The release stated that the Company had suspended all loan origination operations due to market volatility.  Velocity also stated that it was experiencing enhanced delinquencies in its loan portfolio and had implemented various strategies to attempt to "'address this challenge.'"  In presentation materials accompanying the results, Velocity also stated that, as of December 31, 2019, its non-performing loans *had increased 20%* to 6.88% of the Company's total loan portfolio, at the top of the range provided in the Offering Materials.  The Company further stated that even "[h]igher delinquencies are expected from the COVID-19 pandemic."

64.    On May 13, 2020, Velocity issued a release, investor presentation, and held an earnings call providing the Company's financial and operational results for the first quarter of 2020 ("1Q20") – the *same quarter* in which the IPO was conducted. The Company stated that its net income decreased 50% sequentially during the quarter to just $2.6 million.  The Company also confirmed that the suspension of loan originations would continue for an indeterminate length of time, effectively halting all potential growth in the Company's loan portfolio.  In addition, the Company stated that its proportion of non-performing loans had accelerated to $174 million, *nearly double the unpaid principal amount year over year*, and constituted 8.17% of the Company's total portfolio, 252 basis points over the prior year.  Velocity's portfolio yield also fell 32 basis points sequentially to 8.57% due in substantial part to the rising number of non-performing loans.

65.     During the earnings call, Velocity executives further stated that the proportion of non-performing loans had continued to substantially increase and stood at a staggering **9.9%** of the Company's total portfolio by the end of April 2020. Management also confirmed that these adverse results were known and expected as of the IPO, which they characterized as largely due to ordinary portfolio "seasoning" above and beyond any effects of the COVID-19 pandemic, none of which was disclosed in the Offering Materials.  The Company also increased its loan loss reserve by more than 50%, largely due to expected losses from the COVID-19 pandemic, indicating that the adverse trends and significant loan deterioration were likely to continue.

66.     When answering an analyst question about the increase to 9.9% of non-performing loans, defendant Szczepaniak stated that a "chunk" of the increase to 9.9% were loans that underwriters decided "***ha[d] nothing to do with COVID***."  He also stated, "our non-performing did go from 6.88% to 8.17%, [s]o non-performing did ratchet it up in Q1.  And as Chris had mentioned earlier in his overview, ***part of that was expected***."

67.     In the second quarter of 2020 ("2Q20"), Velocity's business continued to flounder.  As a result of Velocity's issuance of $45 million in preferred stock and warrants to its two largest shareholders in order to improve its balance sheet and liquidity, common shareholders suffered a diluted loss per common share of $2.33.  The Company's net interest margin decreased 15% quarter over quarter from $21.8

- 28 -

million in the first quarter to $18.6 million in the second quarter, and portfolio yield decreased from 8.57% in 1Q20 to 7.59% in 2Q20. ***The quarter ended with nearly 15% of non-performing loans, almost double the nearly 8% reported at the end of 1Q20***. And of the $268.8 million in non-performing loans reported by Defendants in 2Q20, only $19.1 million was related to Velocity's COVID-19 forbearance programs. Earnings per share was also down 41% from $.29 per share in the first quarter to $.17 per share in the second quarter.

68.     Velocity's stock price declined significantly subsequent to the IPO. By May 18, 2020, Velocity stock closed at just $2.50 per share – more than ***80% below*** the price investors paid for Velocity shares in the IPO just four months previously.

## VI.     CLASS ACTION ALLEGATIONS

69.     Lead Plaintiff brings this action as a class action on behalf of all purchasers of Velocity common stock pursuant and/or traceable to the Offering Materials (the "Class"). Excluded from the Class are Defendants and their families; the officers, directors, and affiliates of Defendants, and members of their immediate families; the legal representatives, heirs, successors, or assigns of any of the foregoing; and any entity in which any defendant has or had a controlling interest.

70.     The members of the Class are so numerous that joinder is impracticable. Velocity common stock is actively traded on the New York Stock Exchange and millions of shares were sold in the IPO. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery,

Lead Plaintiff believes there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

71.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)     whether Defendants violated the 1933 Act, as alleged herein;

(b)     whether the Offering Materials misrepresented and/or omitted material information in violation of the 1933 Act; and

(c)     whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

72.     Lead Plaintiff's claims are typical of the claims of the Class, as all Class members were similarly affected by Defendants' conduct.

73.     Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in securities class actions.

4831-6467-7072.v8

74.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it exceedingly difficult, if not impossible and impracticable, for Class members to individually redress the wrongs alleged.  There will be no difficulty in managing this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against All Defendants

75.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

76.    This Count is brought under §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

77.    The Registration Statement for the IPO, which was incorporated in and formed part of the Offering Materials, contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

78.    Velocity is the registrant for the IPO.  Defendants were responsible for the contents and dissemination of the Offering Materials.  Defendant Snow Phipps

- 31 -

was the controlling shareholder and private equity sponsor of Velocity at the time of the IPO.   The Individual Defendants signed or authorized the signing of the Registration Statement and/or were designated as director-nominees, including by defendant Snow Phipps.  The Underwriter Defendants marketed and underwrote the IPO and sold stock to Lead Plaintiff and the Class.

79.     As the issuer of the shares, Velocity is strictly liable to Lead Plaintiff and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to Lead Plaintiff and the Class for such material misstatements and omissions.  None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate, or non-misleading.

80.     By reason of the conduct alleged herein, Defendants violated §11 of the 1933 Act.  Lead Plaintiff and the Class members purchased common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations.  At the time of their purchases, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

81.     Less than one year has elapsed from the time that Lead Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims

4831-6467-7072.v8

are based to the time that Lead Plaintiff filed this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Lead Plaintiff filed this action.

## COUNT II

**For Violation of §15 of the 1933 Act**
**Against Velocity, the Individual Defendants, and Snow Phipps**

82.     Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

83.     This Count is brought under §15 of the 1933 Act, 15 U.S.C. §77o, against Velocity, the Individual Defendants, and Snow Phipps.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

84.     As detailed herein, each of these defendants committed primary violations of the 1933 Act by committing conduct in contravention of §11 of the 1933 Act.

85.     The Individual Defendants were each control persons of Velocity by virtue of their positions as directors, senior officers, and/or significant shareholders of the Company.  They each had direct and/or indirect business and/or personal relationships with other directors, officers, and/or major shareholders of the Company. The Company also controlled the Individual Defendants, given the influence and

control the Company possessed and exerted over the Individual Defendants and all of its employees.

86.    Defendant Snow Phipps was the controlling shareholder of the Company at the time of the IPO and sponsored the IPO.  Immediately prior to the IPO, Snow Phipps beneficially owned a majority of Velocity's stock and entered into shareholder agreements with Velocity in order to cement and expand its control over the Company.  In addition, Snow Phipps possessed the ability to nominate two directors to the Velocity Board and controlled the actions of the Individual Defendants affiliated with Snow Phipps, including the managers and directors of Velocity appointed by Snow Phipps to do its bidding on the Board.

87.    By reason of the conduct alleged herein, these defendants violated §15 of the 1933 Act, and Lead Plaintiff and the Class have suffered harm as a result.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, individually and on behalf of the proposed Class, respectfully prays for judgment against Defendants as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as class counsel;

B.    Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

4831-6467-7072.v8

1 wrongdoing, in an amount to be proven at trial, together with prejudgment interest

2 thereon;

3

4          C.      Awarding Lead Plaintiff and the Class their reasonable costs and

5 expenses incurred in this action, including, but not limited to, attorneys' fees and costs

6 incurred by consulting and testifying expert witnesses; and

7

8          D.      Granting such other, further, and/or different relief as the Court deems

9 just and proper.

10                                    **JURY DEMAND**

11          Lead Plaintiff hereby demands a trial by jury.

12

13 DATED:  November 6, 2020               ROBBINS GELLER RUDMAN
                                            & DOWD LLP
14                                        DAVID C. WALTON
                                          DEBRA J. WYMAN
15                                        BRIAN E. COCHRAN

16

17                                               s/ Debra J. Wyman
                                          _____
                                                 DEBRA J. WYMAN
18
                                          655 West Broadway, Suite 1900
19                                        San Diego, CA  92101
                                          Telephone:  619/231-1058
20                                        619/231-7423 (fax)
                                          davew@rgrdlaw.com
21                                        debraw@rgrdlaw.com
                                          bcochran@rgrdlaw.com
22
                                          ROBBINS GELLER RUDMAN
23                                          & DOWD LLP
                                          SAMUEL H. RUDMAN
24                                        JOSEPH RUSSELLO
                                          58 South Service Road, Suite 200
25                                        Melville, NY  11747
                                          Telephone:  631/367-7100
26                                        631/367-1173 (fax)
                                          srudman@rgrdlaw.com
27                                        irussello@rgrdlaw.com

28                                        Lead Counsel for Lead Plaintiff

                                          - 35 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BRONSTEIN, GEWIRTZ &
   GROSSMAN, LLP
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

Additional Counsel for Plaintiff

- 36 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 6, 2020, I authorized

the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF

system which will send notification of such filing to the e-mail addresses on the

attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of

the foregoing via the United States Postal Service to the non-CM/ECF participants

indicated on the attached Manual Notice List.

s/ Debra J. Wyman
DEBRA J. WYMAN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  debraw@rgrdlaw.com

4831-6467-7072.v8

- 37 -

# Mailing Information for a Case 2:20-cv-06780-RGK-PLA Edward A. Berg v. Velocity Financial, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stephen Blake**
  sblake@stblaw.com,nanderson@stblaw.com

- **Brian Edward Cochran**
  bcochran@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James G Kreissman**
  jkreissman@stblaw.com,sstrauss@stblaw.com,nanderson@stblaw.com,sblake@stblaw.com

- **Chet A Kronenberg**
  ckronenberg@stblaw.com,managingclerk@stblaw.com

- **Neal Alan Potischman**
  neal.potischman@davispolk.com,ecf.ct.papers@dpw.com,felicia.yu@dpw.com,angela.quach@dpw.com

- **David C Walton**
  davew@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Debra J Wyman**
  debraw@rgrdlaw.com,debraw@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)