ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN (190812)
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD A. BERG, Individually and on Behalf of All Others Similarly Situated,<br><br>                        Plaintiff,<br><br>        vs.<br><br>VELOCITY FINANCIAL, INC., et al.,<br><br>                        Defendants. | Case No. 2:20-cv-06780-RGK-PLA<br><br><u>CLASS ACTION</u><br><br>LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS<br><br>DATE:        December 21, 2020<br>TIME:         9:00 a.m.<br>CTRM:       850<br>JUDGE:      Hon. R. Gary Klausner |

4834-6689-7619.v10

# TABLE OF CONTENTS

**Page**

I.   Introduction and Statement of Facts ..................................................... 1

II.  Legal Standards Applicable to Defendants' Motion ....................................... 5

III. The Complaint Adequately Pleads Violations of the 1933 Act .................... 6

    A.   Statements Regarding Velocity's Underwriting Practices Were Materially False and Misleading ............................................... 6

        1.   Velocity Did Not Adequately Disclose the Risks Associated with Its Underwriting Practices .............................. 7

        2.   Statements Concerning Velocity's Underwriting Practices Are Not Puffery ................................................ 9

        3.   Statements Concerning Underwriting Practices Are Not Mere Opinion Statements ......................................... 10

    B.   The Offering Materials Failed to Inform Investors About Rising Delinquent and Non-Performing Loans ................................ 10

        1.   The Complaint Does Not Plead Fraud-by-Hindsight .............. 10

        2.   Defendants Failed to Comply with Item 303's Disclosure Requirements ........................................... 11

        3.   Defendants Cannot Establish Negative Causation as a Matter of Law ............................................. 14

    C.   Statements About the Market and Velocity's Ability to Capitalize on It Were Materially False and Misleading ................. 16

        1.   Statements About Market Conditions Were Not Puffery ......... 16

        2.   Statements About Market Condition and Velocity's Ability to Capitalize on It Were Misleading When Made ....... 17

        3.   Defendants' Truth on the Market Defense Fails ..................... 18

        4.   Velocity Did Not Adequately Disclose COVID Risks ........... 19

    D.   The Complaint Adequately Alleges Control Person Liability............ 20

IV.  Conclusion.................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*AES Corp. v. Dow Chem. Co.*,
   2001 WL 34367296 (D. Del. Jan. 19, 2001) ........................................ 20

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .................................... 17

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ........................................................ 8, 11

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ............................................................ 11

*Brothers v. Hewlett-Packard Co.*,
   2006 WL 3093685 (N.D. Cal. Oct. 31, 2006) .................................... 17

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ......................................................... 20

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ............................................................. 9

*Garbini v. Prot. One, Inc.*,
   49 F. App'x 169 (9th Cir. 2002) ...................................................... 15

*Greenberg v. Sunrun, Inc.*,
   233 F. Supp. 3d 764 (N.D. Cal. 2017) .............................................. 17

*Hemmer Grp. v. Sw. Water Co.*,
   527 F. App'x 623 (9th Cir. 2013) .................................................... 20

*Herman & Maclean v. Huddleston*,
   459 U.S. 375 (1983) ...................................................................... 1, 6

*Hildes v. Arthur Andersen LLP*,
   734 F.3d 854 (9th Cir. 2013) ............................................................. 6

*In re Atossa Genetics Inc. Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ........................................................... 19

- ii -

1

2                                                                                      **Page**

3
*In re Bridgepoint Educ., Inc. Sec. Litig.*,
4        2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ...............................................9, 16

5
*In re CBT Grp. PLC Sec. Grp. Litig.*,
6        2001 WL 1822729 (N.D. Cal. Dec. 28, 2001) .................................................. 18

7
*In re Charles Schwab Corp. Sec. Litig.*,
8        257 F.R.D. 534 (N.D. Cal. 2009) ..................................................................... 20

9
*In re Daou Sys., Inc. Sec. Litig.*,
10       411 F.3d 1006 (9th Cir. 2005)......................................................................5, 15

11   *In re Deutsche Bank AG Sec. Litig.*,
         2016 WL 4083429 (S.D.N.Y. July 25, 2016) .................................................. 17
12

13   *In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
         986 F. Supp. 2d 487 (S.D.N.Y. 2013).................................................12, 13, 14
14

15   *In re Immune Response Sec. Litig.*,
         375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................7

16
*In re Infonet Servs. Corp. Sec. Litig.*,
17       310 F. Supp. 2d 1080 (C.D. Cal. 2003).............................................................. 19

18
*In re Intuitive Surgical Sec. Litig.*,
19       65 F. Supp. 3d 821 (N.D. Cal. 2014)................................................................ 19

20   *In re Musicmaker.com Sec. Litig.*,
         2001 WL 34062431 (C.D. Cal. June 4, 2001)................................................... 11
21

22   *In re New Century*,
         588 F. Supp. 2d 1206 (C.D. Cal. 2008)............................................................ 15
23

24   *In re Shoretel, Inc. Sec. Litig.*,
         2009 WL 2588881 (N.D. Cal. Aug. 19, 2009)................................................. 15
25

26   *In re Snap Inc. Sec. Litig.*,
         2018 WL 2972528 (C.D. Cal. June 7, 2018)........................................................8

27

28

**Page**

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ................................................................. 19

*In re Thoratec Corp. Sec. Litig.*,
    2006 WL 1305226 (N.D. Cal. May 11, 2006) ................................... 18

*In re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ................................... 12

*Lilley v. Charren*,
    17 F. App'x 603 (9th Cir. 2001) ........................................................ 7

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ...................................................... 13, 14

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ............................................................................. 9

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ............................................... 6, 11, 19

*Mingbo Cai v. Switch, Inc.*,
    2019 WL 3065591 (D. Nev. July 12, 2019) ................................... 19

*Mulligan v. Impax Lab'ys, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................ 9

*Omnicare, Inc. v. Laborers Dist. Council*
    *Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...................................................... 1, 10, 16

*Panther Partners v. Ikanos Commc'ns, Inc.*,
    681 F.3d 114 (2d Cir. 2012) ............................................................ 14

*Pinter v. Dahl*,
    486 U.S. 622 (1988) .......................................................................... 1

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) .................................. 7, 14, 19

**Page**

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................ 16

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ............................................................. 8, 18

*Rodriguez v. Gigamon Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) .................................................. 10

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ........................................................... 17, 19

*Steckman v. Hart Brewing, Inc.*,
   143 F.3d 1293 (9th Cir. 1998) ........................................................... 11, 12

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ............................................................. 10, 16

*Va. Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083 (1991) ......................................................................... 8, 9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77k ...........................................................................................*passim*
   §77k(e) ........................................................................................... 14
   §77o(a) ........................................................................................... 20

17 C.F.R.
   §229.105 .......................................................................................... 8
   §229.303(a) ..................................................................................... 12
   §229.303(a)(3)(ii) ........................................................................... 12

**SECONDARY AUTHORITIES**

*Management's Discussion and Analysis of Financial Condition and Results of
   Operations; Certain Investment Company Disclosures*,
   54 Fed. Reg. 22427-01 (May 24, 1989) .............................................. 12

# I.      Introduction and Statement of Facts

"The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offering of securities on interstate commerce." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988).  Consistent with this purpose, §11 of the Securities Act of 1933 ("1933 Act") "was designed to . . . impos[e] a stringent standard of liability on the parties who play a direct role in a registered offering" and "to provide greater protection to purchasers of registered securities."  *Herman & Maclean v. Huddleston*, 459 U.S. 375, 381-83 (1983).  Thus, "Congress adopted §11 to ensure that issuers 'tell[] the whole truth' to investors."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015).  Defendants, here, did not.[1]

Velocity is a real estate finance company that issues, manages, and securitizes loans used by borrowers to finance the purchase of investment properties – primarily single-family rental homes with one-to-four unit residential investments and small commercial properties.  ¶27.  The Company portrayed itself as a disciplined lender, assuring investors that it implemented a hands-on, data-driven approach to provide effective due diligence in its underwriting process, weed out potentially troublesome borrowers, and construct a high-quality loan portfolio to maximize potential yields, which generated revenue for the Company.  ¶28.  Velocity holds for securitization and sale to investors a portion of the loans it originates, and holds the remainder of the loans it originates in its investment portfolio.  ¶¶31-32.

Velocity's primary product is a 30-year amortizing term loan used to finance long-term real estate investments.  ¶29.  In the lead up to the IPO, the Company

---

[1]   "Defendants" include Velocity Financial, Inc. ("Velocity" or the "Company"), its officers and directors who signed and reviewed the Offering Materials, its controlling shareholder, and the underwriters who conducted the IPO.  ¶¶10-25.  All "¶" or "¶¶" references are to the Amended Complaint for Violations of the Securities Act of 1933 (ECF No. 40) (the "Complaint"), and citations are omitted and emphasis is added throughout, unless otherwise noted.

sought to grow its loan portfolio.  ¶30.  Between December 31, 2016 and September 30, 2019, Velocity increased its loan portfolio by 90%, earning $113 million in interest income in the first three quarters of 2019 alone.  ¶¶30, 39.  Velocity's ability to continue to grow its loan portfolio and generate profitable, performing loans was critical to its future business prospects, and of key importance to investors.  ¶30.

Velocity filed its Registration Statement on Form S-1 with the U.S. Securities and Exchange Commission ("SEC") on October 18, 2019.  The Registration Statement underwent several amendments before being declared effective on January 16, 2020.  ¶34.  The final version of the Registration Statement was signed by Velocity's CEO, defendant Christopher D. Farrar, CFO, defendant Mark R. Szczepaniak, Chief Accounting Officer, defendant Christopher J. Oltmann, and Velocity's Board of Directors.  ¶¶12-14, 23.[2]  On January 17, 2020, the Company filed its final Prospectus, dated January 16, 2020 (which incorporated and formed part of the final Registration Statement), and containing updated financial information, with the SEC.  ¶34.  Defendants used the Offering Materials to sell over 8.3 million shares of Velocity common stock to the public at $13 per share, earning over $108 million in gross proceeds from the IPO.  ¶35.

The Offering Materials touted Velocity's underwriting policies and processes, claiming that they "differentiated" Velocity's business from its competitors.  ¶37. Among these key "Competitive Advantages" was the Company's "Customized Technology and Proprietary Data Analytics."  *Id.*  Specifically, the Offering Materials represented to investors that Velocity's underwriting approach "is enhanced by automation through the extensive use of customized systems to power automation and drive our use of data analytics."  *Id.*  The Company also represented that its "extensive

---

[2]   Defendants Alan H. Mantel, Ian K. Snow, John A. Pless, Brandon Kiss, Ogden Phipps, and Daniel J. Ballen sat on Velocity's Board of Directors.  ¶¶15-20.  Additionally, defendants John P. Pitstick and Joy L. Schaefer were identified in the Offering Materials as "incoming directors" and while neither signed the Registration Statement, each reviewed and helped to prepare the Offering Materials.  ¶¶21-23.

access to proprietary data gives us a differentiated prospective and underwriting ability." *Id.* According to the Offering Materials, these underwriting tools allowed Velocity to "focus[] on generating attractive returns while minimizing credit losses," and positioned the Company "for sustainable, long-term growth." *Id.*

The Offering Materials also emphasized the growth in the Company's loan portfolio, and consistent increase in the portfolio yield, leading up to the IPO. ¶39. The Offering Materials reported that while the Company had dramatically grown its portfolio size, the proportion of those loans that were non-performing, *i.e.* more than 90-days delinquent, as of the end of the fourth quarter of 2019 ("4Q19"), remained in a moderate range. ¶¶40-42.

Defendants also reported on loans the Company held for investment that were delinquent, but not yet "non-performing." ¶45. While the Offering Materials provided information through 4Q19 on the percentage of non-performing loans in Velocity's overall portfolio in an upfront manner, the information about delinquent loans held for investment stopped with the third quarter of 2019 ("3Q19"). *Id*. Defendants buried that information as a single-line item in a 28-page listing of various financial metrics, which showed that as of 3Q19 delinquent loans, not yet 90-days past due, comprised 8.3% of the loans held for investment. ECF No. 45-3 at 71.

After the IPO was completed, Velocity announced its financial results for 4Q19 and fiscal year ("FY") 2019. ¶63. While this announcement was made on April 8, 2020, the financial results being reported were for the period ***immediately prior to the IPO, ending December 31, 2019***. *Id.* Velocity informed investors that "[l]oan origination volume growth was primarily driven by a 103 percent year-over-year growth in short-term loans," made to borrowers that "do not meet the investment criteria" for Velocity's "30-year primary product." ¶47. Not surprisingly, these loans to riskier borrowers resulted in increasing delinquencies. ¶63. For instance, in 4Q19, the Company reported a 20% increase in its non-performing loans, over the 3Q19 levels included in the Offering Materials. ¶42. Velocity also announced that the

- 3 -

amount of loans held for investment that were delinquent and approaching non-performing status in 4Q19, had grown to 9.3% – a 12% increase from the 3Q19 figure provided in the Offering Materials, with a majority of that increase in the 60-89 days past due bucket and poised to convert to non-performing status as early as January 1, 2020.  ¶45.  The Offering Materials were silent about this fact despite that this information was available to Defendants as of December 31, 2019, *three weeks before the IPO*.

These trends of increasing delinquencies translated to higher levels of non-performing loans in Velocity's portfolio reported by the Company in the quarters following the IPO's completion.  By the first quarter of 2020 ("1Q20") – the same quarter the IPO was conducted, the non-performing loans in Velocity's portfolio had grown *by 27% from 4Q19* to 8.76%.  ¶42.  The same alarming trend of non-performing loans were experienced in Velocity's loans held for investment which saw *a 30% increase from 4Q19* to 7.9%.  *Id.*  And delinquency rates in Velocity's loans held for investment had exploded as well, swelling to 10.1% – *an astonishing 22% increase* over the delinquency levels from 3Q19 reported by Defendants in the Offering Materials.  *Id.*  Velocity told investors that the increases in its non-performing loans were "expected" and due to ordinary portfolio "seasoning," but the Offering Materials were silent as to Velocity's expectation of these troubling delinquency trends.  ¶¶65-66.

At the same time that Defendants undertook the IPO, the COVID-19 pandemic was spreading around the world, and invading the United States.  ¶51.  The brewing pandemic threatened to devastate large population centers – Velocity's primary markets included – posing more than a speculative threat to the Company's market and ability to operate and grow its business as the Offering Materials had represented to investors.  ¶¶48-50.  The Offering Materials did not provide any warnings of the unique risks the growing pandemic posed to Velocity.  ¶52.

And while the COVID-19 pandemic was raging in the United States when

- 4 -

Velocity finally provided investors with information about the true state of the health of its loan portfolio, the Company blamed the increasing delinquency rates on factors other than the pandemic.  ¶¶66-67.  In fact, in addressing the dramatic increase in Velocity's non-performing loans reported with its 1Q20 earnings announcement, the Company's CFO, Szczepaniak, told the market that a "chuck" of the increase were loans that underwriters decided "*had] nothing to do with COVID*."  ¶66.  When the amount of Velocity's non-performing loans had swelled to 15% of its portfolio, or $268.8 million in loans, by the second quarter of 2020 ("2Q20"), Velocity reported that only $19.1 million, or 7%, were related to the Company's COVID-19 forbearance programs.  ¶67.  In truth, the rising delinquency and non-performing rates were a direct result of the Company's decision, ***prior to the IPO***, to open its loan coffers to risky borrowers – a decision the Offering Materials fails to mention and the negative results of which were already apparent at the time of the IPO.  ¶¶41-47.

The damage to investors from the Company's pre-IPO decisions to lend to risky borrowers, however, was done.  While investors spent $13 per share to buy Velocity's stock in the IPO, after the Company came clean in 1Q20 and gave investors a fuller picture of the risky loans it had made that were impacting the health of its loan portfolio, the value of Velocity's stock plunged by May 18, 2020 to a low of $2.50 per share – an 80% reduction in value in less than four months.  ¶¶9, 68.

## II.     Legal Standards Applicable to Defendants' Motion

Section 11 of the 1933 Act provides a cause of action for any purchaser against issuers, underwriters, and other participants in a public securities offering of a security when "any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. §77k; *see also In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005).  Section 11 does not require Lead Plaintiff to plead or prove scienter, loss causation, or reliance.

- 5 -

*Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 856, 859 (9th Cir. 2013).  As a result, §11 claims "place[] a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382.  Thus, Lead Plaintiff need only show the purchase of a security by means of a prospectus or oral communication that "includes an untrue statement of material fact or omits to state a material fact that is necessary to make the statements not misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 885 (9th Cir. 2008).

As the Supreme Court has held, under §11, liability of an issuer is "virtually absolute, ***even for innocent misstatements***." *Huddleston*, 459 U.S. at 382.  Other defendants may avoid liability, but those defendants still "bear the burden of demonstrating due diligence." *Id*.[3]

## III.   The Complaint Adequately Pleads Violations of the 1933 Act

### A.   Statements Regarding Velocity's Underwriting Practices Were Materially False and Misleading

The Complaint alleges that the Offering Materials falsely characterized Velocity's underwriting practices.  ¶¶37-38.  For example, the Offering Materials stated Velocity's underwriting practices focused on "minimizing credit losses" and that the Company "appl[ies] the same disciplined due diligence and underwriting process to all loans [it] review[s]." ECF No. 45-3 at 111.  They also stated that "[w]e believe our extensive access to proprietary data gives us a differentiated perspective and underwriting ability." *Id*.  As alleged, these statements were materially false and misleading when made because, contrary to Defendants' assertions and undisclosed in the Offering Materials: (1) the underwriting practices had been relaxed to allow for exponential growth in origination of short-term, interest-only loans; (2) management expected the proportion of non-performing loans would increase as the newly-originated loans seasoned; and (3) Velocity's proportion of non-performing loans normally runs higher than that of a bank's or other lender's.

---

[3]   No defendant has raised a due diligence defense in their motion.

4834-6689-7619.v10

### 1.   Velocity Did Not Adequately Disclose the Risks Associated with Its Underwriting Practices

Faced with these glaring omissions, Defendants rely on one isolated financial metric and two vague statements in the Offering Materials to argue they disclosed the underwriting practice risks.  ECF No. 45 ("Mtn.") at 8.  In support of their arguments, Defendants cite to a *28-page financial chart* that contains *a single-line item* showing the unpaid principal balance of loans held for sale for FY 2018 and 3Q19, and vague statements *27 pages earlier* in the Offering Materials that "[l]oans on properties in transition will involve a greater risk of loss," and that short-term loans typically serve "as an interim solution for borrowers and/or properties that do not meet the investment criteria of our primary 30-year product."  ECF No. 45-3 at 34; Mtn. at 9.  Defendants also highlight a statement that Velocity's underwriting guidelines "may result in higher delinquency and default rates than those experienced by mortgage lenders with broader underwriting guidelines."   ECF No. 45-3 at 31; Mtn. at 9.[4]   These "disclosures" do not save Defendants from liability.  Whether "some risks [are] disclosed . . ., the overall determination of whether there was adequate disclosure" remains a question of fact.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005); *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 387 (N.D. Cal. 2020) ("the ultimate question of 'whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact'").  Even if this were a proper stage to raise this argument, it fails for three reasons.

*First*, describing as hypothetical a risk already realized is at best misleading.  "[L]earning that stop-work orders *might* be issued is quite different from knowing they were *in fact* issued. One indicates a risk, the other a certainty. It goes without

---

[4]    Defendants cite *Lilley v. Charren*, 17 F. App'x 603 (9th Cir. 2001), to support their argument that they fully disclosed the risks associated with their making of short-term loans.  Mtn. at 9.  But, in *Lilley*, unlike here, the prospectus contained "ample and comprehensive risk disclosures" concerning nine specific risk areas.  17 F. App'x at 608 & n.1.  The Offering Materials here contained no such information.

saying that investors would treat the two differently." *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 987 (9th Cir. 2008) (emphasis in original); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) ("hypothetical risk disclosures . . . do not absolve Defendants of their duty to disclose known material" facts).  Accordingly, stating that Velocity's underwriting guidelines ***may*** result in higher delinquency than other lenders' fails to disclose that Velocity's underwriting processes had been relaxed to ***actually*** allow more riskier loans to be made than other lenders.

       ***Second***, risk disclosures must be reported under a subheading that ***adequately describes the risk*** that follows.  17 C.F.R. §229.105.  Defendants rely heavily on the inclusion of a single-line item in a voluminous table of financial metrics that stated the unpaid principal balance of loans held for sale in FY 2018 versus 3Q19.  Mtn. at 8; s*ee* ECF No. 45-3 at 61.  However, there is no accompanying narrative explaining the risk associated with that particular line item.  Instead, the words Defendants point to appear ***27 pages earlier in the Offering Materials*** and inform investors only that short-term loans are issued to borrowers that do not qualify for the fully-amortizing loans and that they involve a "greater risk of loss."  ECF No. 45-3 at 34.  Even if this was an adequate disclosure (and it is not), Defendants did not describe the ***actual*** risk: that the underwriting practices were relaxed to allow for an exponential increase in loans that were more likely, and indeed expected, to become delinquent.  One line item hidden in a lengthy table of financial metrics, ***27 pages after*** vague warnings supposedly describing the risk associated with that line item, are woefully insufficient to meet Defendants' disclosure obligations.  *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."); *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (the disclosed truth must be ""transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created

by [Defendants'] one sided representations'"'").

*Finally*, the piecemeal disclosures to which Defendants point are insufficient to overcome the clear and repeated emphasis in the Offering Materials on Velocity's underwriting quality and growth, issues Defendants do not dispute are material to investment in a finance company in the business of making loans. *Va. Bankshares*, 501 U.S. at 1097 ("a misleading statement will not always lose its deceptive edge simply by joinder with others that are true"); *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) (inclusion of some accurate information is not sufficient to conclude as a matter of law that defendants' underwriting practice statements were not misleading).

### 2. Statements Concerning Velocity's Underwriting Practices Are Not Puffery

At the pleading stage, only statements "on the extreme edge of generality and vagueness" can be held immaterial. *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014) (rejecting puffery defense as challenged statements "not so 'obviously unimportant' to shareholders as to warrant dismissal"). Defendants point only to single words and one, two-word phrase – "differentiated," "disciplined," "proprietary," and "[c]ustomized [t]echnology" – ignoring the requirement that "the court must analyze the context in which the statements were made." *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013); Mtn. at 9. However, when considered properly, Defendants' arguments fail because their statements concern the crux of Velocity's business – Velocity's success as a loan originator rises and falls with its underwriting practices and ability to originate performing loans. Because its underwriting practices presented risks to Velocity's main revenue-generating ability, statements about the practices cannot be immaterial as a matter of law. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (finding false statements actionable where defendant corporation had, but did not disclose, "information indicating a significant risk to its leading revenue-generating

- 9 -

product").[5]

### 3.    Statements Concerning Underwriting Practices Are Not Mere Opinion Statements

Defendants' argument that the underwriting practice statements are inactionable opinion statements because they convey Defendants' beliefs only, and opinion statements are actionable only if Defendants did not believe them, are incorrect and misstate the law governing opinion-type statements.   Mtn. at 9 n.6.   Opinion statements are actionable if defendants omit information, and the omission makes the statement misleading. *See Omnicare*, 575 U.S. at 190-91; *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (noting that *Omnicare* held that "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor").   Even assuming Velocity's underwriting practice statements are opinion statements (which they are not), they are actionable because Defendants omitted that the underwriting practices had been relaxed to allow for increased short-term loan originations and that Velocity's practices allow for more non-performing loans than other lenders – making the statements about the Company's underwriting practices misleading.

### B.    The Offering Materials Failed to Inform Investors About Rising Delinquent and Non-Performing Loans

### 1.    The Complaint Does Not Plead Fraud-by-Hindsight

Defendants argue that because the Complaint does not allege that the historical financial information contained in the Offering Materials was false, Lead Plaintiff's claim fails.   Mtn. at 10.   This is untrue.   The Complaint alleges that Defendants'

---

[5]   Defendants' puffery arguments notably ignore their statements that Velocity's underwriting practices focused on "minimizing credit losses" and that the Company "appl[ies] the same disciplined due diligence and underwriting process to all loans [it] review[s]."   ¶37; *see* Mtn. at 9. These statements provide a concrete description of underwriting policies that go beyond mere feel-good statements and thus are not simply puffery. *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018).

failure to include fulsome information about Velocity's loan delinquencies rendered their statements about the financial health of the Company, specifically the loan portfolio, misleading (¶¶39-47), squarely within the gambit of a properly pled §11 claim.  Indeed, the Ninth Circuit has held that a statement or omission "is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  *Berson*, 527 F.3d at 985 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Furthermore, Defendants relying solely on out-of-circuit authority (Mtn. at 10), ignore that the Ninth Circuit has also held that even literally true statements may mislead, due to their context and manner of presentation.  *Miller*, 519 F.3d at 886; *see also In re Musicmaker.com Sec. Litig.*, 2001 WL 34062431, at *11 (C.D. Cal. June 4, 2001) ("'Some statements, though literally accurate, can become, through their context and manner of presentation, devices which mislead investors.'").

This is precisely the situation here.  The Complaint alleges that Defendants had available to them at the time of the IPO the actual 4Q19 delinquency rates and information about the growing levels of delinquencies in its loan portfolio.  ¶¶40, 44. Defendants omitted this information from the Offering Materials, rendering the rosy picture of the health of the Company's loan portfolio misleading.  And because Defendants had this information at the time of the IPO, their arguments that the Complaint is a "impermissible hindsight pleading" are baseless, and the authority relied upon are distinguishable on that basis.  Mtn. at 12-13.

### 2. Defendants Failed to Comply with Item 303's Disclosure Requirements

The Offering Materials were required to disclose "'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'"  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th

Cir. 1998) (quoting 17 C.F.R. §229.303(a)(3)(ii)).[6]  Unless a company conclusively rules out both the particular event, trend, or uncertainty, and any reasonable likely impact therefrom, Item 303 requires disclosure.  *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 511-12 (S.D.N.Y. 2013).[7]  "The Ninth Circuit has held that because Section 11 imposes liability if a registrant 'omits to state a material fact required to be stated' in the registration statement, 'any omission of facts "required to be stated" under Item 303 will produce liability under Section 11.'"  *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *15 (N.D. Cal. Oct. 31, 2014) (quoting *Steckman*, 143 F.3d at 1296).

Here, the Complaint clearly pleads that Defendants had information concerning the increasing levels of delinquencies and that they chose to not include in the Offering Materials the most recently available information about this rising trend, and its impact on the Company's financial health.  ¶¶39-47.  Moreover, the Complaint pleads that this omitted information was material and important to Velocity's financial condition – something Defendants' motion does not challenge.  ¶¶63-68.  Ignoring these allegations, Defendants duplicitously argue that the Offering Materials disclosed that delinquencies were increasing.  Mtn. at 11-15.

Defendants contend that the Complaint evidences that they disclosed the increasing trend in non-performing loans in the Offering Materials.  Mtn. at 11 (citing ¶41).  Not so.  The disclosure of estimated 4Q19 non-performing loans (and the prior year non-performing rates) Defendants cite (Mtn. at 11) only, however, tells part of the story.  "Item 303 require[s] more than the mere identification of trends that were

---

[6]   Instruction 3 to paragraph 303(a) provides that "[t]he discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  17 C.F.R. §229.303(a) instruction 3.

[7]   The SEC has provided that along with "known trends," Item 303 requires "disclosure of forward-looking information," including, at a minimum, disclosure of the "reasonably likely material effects on operating results of a known trend."  *See Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, 54 Fed. Reg. 22427-01, at *22428-*22429 (May 24, 1989).

- 12 -

occurring in the defendant's business." *Facebook*, 986 F. Supp. 2d at 509. "'[T]he relevant question under Item 303 is whether [the company] reasonably expects the impact to be material.'" *Id.* (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 719 (2d Cir. 2011)). The Complaint alleges that not only did Defendants fail to disclose these troubling delinquency trends and relaxation of the underwriting policies that permitted riskier loans to be made, they have admitted the delinquency increases were expected. ¶¶65-66.

As discussed above (§§I., III.A.), while Defendants touted the Company's robust underwriting approach, emphasizing that the procedures were designed to "minimiz[e] credit losses," the Offering Materials failed to inform investors that ***prior to the IPO***, Velocity had ***increased by 103%*** the amount of short-term loans it made, that those borrowers did not meet the Company's credit criteria for its primary 30-year product and that as a result, there were higher levels of much riskier loans in Velocity's portfolio. And, while Defendants buried in a single-line item in a 28-page list of financial metrics what the level of delinquent but not yet non-performing loans were in 3Q19, Defendants did not provide updated 4Q19 numbers for that metric – as they did for the non-performing loans – in the Offering Materials, nor did they describe the risk associated with the increasing delinquency buckets in light of the increased number of riskier loans in the Company's portfolio. ¶¶45-46. That omission is particularly telling because the level of delinquent loans increased 12% between 3Q19 and 4Q19 – with the 60-89 days delinquent bucket alone, ***poised to become non-performing as early as January 1, 2020, increasing by 30% in one quarter – all prior to the IPO***. ¶45.

Defendants argue that Lead Plaintiff claims that they "should have simply assumed" these loans would become non-performing as of the IPO. Mtn. at 14. That argument misses the mark, and is untrue nonetheless. Lead Plaintiff claims that because Defendants failed to inform investors about the relaxed underwriting and increase in loans to riskier borrowers, the increasing trend of delinquencies told an

- 13 -

important story about the health of the Company's loan portfolio.  Also, Defendants did not have to "assume" these loans, or some portion of them, would become non-performing because *it was already happening at the time of the IPO, and according to Velocity's CFO was something that the Company "expected*." ¶66.[8]  The quality of the loans being made by the Company was a crucial and fundamental pillar upon which Velocity's financial health depended.   That context is an important consideration in determining whether Defendants violated Item 303's disclosure obligations.  *Facebook*, 986 F. Supp. 2d at 509 (citing *Panther Partners v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012)).

Item 303 requires that "'key information'" about "'whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect [Velocity's] investments'" be disclosed  *Id.* at 511-12 (quoting *Litwin*, 634 F.3d at 718-19).  Despite knowing at the time of the IPO that Velocity had (1) relaxed its underwriting processes, (2) increased the amount of loans to riskier borrowers by 103%, (3) that the bucket of delinquent loans, on the cusp of non-performing had increased by 30% in one quarter, and (4) that Velocity "expected" these levels of increased delinquencies, the Offering Materials contained no disclosure about this "known trend, event or uncertainty" in violation of Item 303.

### 3. Defendants Cannot Establish Negative Causation as a Matter of Law

Without expressly saying so, Defendants attempt to mount an improper and premature negative causation defense.  Mtn. at 14-15.  The affirmative defense of "negative causation" requires a defendant to show that, on the face of the complaint, the alleged misrepresentation could not have caused a plaintiff's damages as a matter of law.  *See* 15 U.S.C. §77k(e).  But this defense is available to a defendant *only* "if it

---

[8]   That the delinquency and non-performing loan rates exploded in 1Q and 2Q20 is further indication that the undisclosed, pre-IPO relaxation of underwriting processes and the delinquency levels Defendants were aware about at the time of the IPO, should have been disclosed in the Offering Materials.  In any event, whether a given fact or pattern "constitute[s] a 'trend' is a factual inquiry for a later stage."  *Pirani*, 445 F. Supp. 3d at 386.

can ***prove*** that the depreciation in value of the securities resulted from factors other than its allegedly false or misleading misstatement." *Garbini v. Prot. One, Inc.*, 49 F. App'x 169, 170 (9th Cir. 2002); *see also In re New Century*, 588 F. Supp. 2d 1206, 1238 (C.D. Cal. 2008) ("'the defendant has a heavy burden of proving that the decline in stock price was caused by factors other than the misstatement(s) in the registration statement'"). To make this showing, Defendants must show that the allegations "***absolutely 'foreclose[d]*** the possibility that defendants caused plaintiffs' losses.'" *In re Shoretel, Inc. Sec. Litig.*, 2009 WL 2588881, at *4 (N.D. Cal. Aug. 19, 2009). Defendants have not met their burden.

Defendants contend that the delinquencies Velocity reported were the result of "business closures, spike in unemployment and global recession caused by the intervening COVID-19 pandemic." Mtn. at 14-15. This contention is belied by the fact that the Complaint alleges that the spike in delinquencies was occurring ***before the IPO and COVID***, and increasing throughout 1Q20, which ended on March 31, 2020 – mere weeks after the first stay-at-home orders went into effect in various parts of the United States that resulted in "business closures" and rising unemployment. ¶45.[9] And Velocity told investors that their underwriters had determined that a "chunk" of the delinquencies reported in 1Q20 "***ha[d] nothing to do with COVID***," and that "***part of that was expected***." ¶66. Finally, the Company reported in 2Q20 that only 7%, or $19.1 million, of its nearly $270 million non-performing loans were related to COVID. ¶67. On this motion, the Court must "'accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs.'" *Daou*, 411 F.3d at 1013. Defendants have not, and cannot, ***prove as a matter of law*** that their false and misleading statements did not cause the loss in value of Velocity's stock. This factual dispute will have to be resolved at a later stage.

---

[9]   Jiachuan Wu, et al., *Stay-at-home orders across the country*, NBC News (Apr. 29, 2020), https://www.nbcnews.com/health/health-news/here-are-stay-home-orders-across-country-n1168736.

### C.    Statements About the Market and Velocity's Ability to Capitalize on It Were Materially False and Misleading

The Complaint alleges that the Offering Materials misleadingly described the market and Velocity's ability to capitalize on it.  ¶¶39-52.  For example, the Offering Materials state Velocity "operate[s] in a large and highly fragmented market with **substantial demand** for financing and **limited supply** of institutional financing alternatives," has "developed the highly-specialized skill set required to effectively compete in this market," and has "a durable business model capable of generating attractive risk-adjusted returns for [its] stockholders **throughout various business cycles**."  ¶48; ECF No. 45-3 at 62, 102.  As alleged, these statements were materially false and misleading when made because they omitted that there was a disease outbreak that was likely to disrupt the economy, and that Velocity's relaxed underwriting practices and the resulting increase in non-performing loans made it particularly susceptible to market downturns.

### 1.    Statements About Market Conditions Were Not Puffery

Defendants contend that various statements about the market condition are non-actionable puffery.  Mtn. at 16. [10]  Defendants' argument fails because they again strip the statements from their critical context – cherry-picking individual phrases from whole sentences.  In the Ninth Circuit, however, "the court must analyze the context in which the statements were made."  *Bridgepoint*, 2013 WL 5206216, at *17; *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (in assessing puffery, "the context in which the statements were made is key").  Taken in context, Defendants' statements cannot be puffery because they

---

[10]   Defendants also argue these statements are non-actionable opinion because Lead Plaintiff did not plead Defendants did not hold the opinion at the time of the IPO. Mtn. at 16 n.9. However, this is not required. *See Omnicare*, 575 U.S. at 190-91. As discussed herein, Lead Plaintiff alleges that Defendants omitted facts which made their representations misleading which is sufficient to state a claim. *Sanofi*, 816 F.3d at 210 (noting that *Omnicare* held that "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor").

- 16 -

"'address specific aspects'" that the Company knew "'to be performing poorly.'"  *See Azar v. Yelp, Inc.*, 2018 WL 6182756, at *12 (N.D. Cal. Nov. 27, 2018). ("'"[G]eneral statements of optimism, when taken in context, may form a basis for a securities fraud claim" when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly.'").  For example, Velocity touted its ability to generate attractive returns "throughout various business cycles" and to "effectively compete" but omitted that its increased delinquent and non-performing loans made the Company uniquely susceptible to market downturns.  ECF No. 45-3 at 62, 102.[11]

### 2. Statements About Market Condition and Velocity's Ability to Capitalize on It Were Misleading When Made

Defendants next contend their statements about the market condition were not misleading when made because they were not aware of the COVID risks at the time the statements were made.  Mtn. at 17.[12]  Notably, Defendants do not argue that their statements about Velocity's ***ability to capitalize*** on the market were not misleading when made – they were.  At the time of the IPO, Defendants were aware that Velocity's non-performing loans normally run higher than other lenders', and that the Company's relaxed underwriting practices allowed for an exponential increase in short-term loan origination to riskier borrowers that was expected to increase the Company's total nonperforming loans.  ¶¶39-47.  While Defendants extolled

---

[11]  Defendants' authority is inapposite.  For example, the puffery in *Greenberg v. Sunrun, Inc.*, 233 F. Supp. 3d 764, 770-71, 774-75 (N.D. Cal. 2017), concerned the business in general and not any risks that plaintiffs had identified, unlike here, where Defendants painted a rosy picture about the market rather than acknowledge its risks.  In *In re Deutsche Bank AG Sec. Litig.*, 2016 WL 4083429, at *28 (S.D.N.Y. July 25, 2016), and *Brothers v. Hewlett-Packard Co.*, 2006 WL 3093685, at *5 (N.D. Cal. Oct. 31, 2006), the statements are "not capable of objective verification," unlike Velocity's statements here about the supply and demand for its product, as well as whether it applies the same underwriting standards to all loans.

[12]  Defendants' citation to *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009), does not help them.  Mtn. at 17.  There the court determined the defendant company "***could not know***" that certain board members might engage in deceptive phone calls after the IPO unlike here, where Defendants ***already knew*** about the COVID outbreak before the IPO.

- 17 -

Velocity's ability to effectively compete in the market and to generate attractive returns through various business cycles, they failed to disclose that Velocity's underwriting practices had been relaxed making the Company more susceptible to market downturns than other lenders. *In re CBT Grp. PLC Sec. Grp. Litig.*, 2001 WL 1822729, at \*4 (N.D. Cal. Dec. 28, 2001) (finding company liable when it failed to disclose material facts about its "competitive position").

Defendants instead rely on the argument that they could not have predicted COVID's impact on its market and that because the pandemic was only beginning to spread, they could ignore its existence. Mtn. at 17. While it is true the securities laws do not require clairvoyance, they do not permit negligence. At the time of the IPO, COVID had already gained worldwide attention.[13] And disease outbreaks historically and consistently disrupt the economy and real estate markets.[14] Lead Plaintiff does not claim that Defendants were required to predict the full extent of COVID's impact on its business, but they were required to acknowledge the risks of a disease outbreak that had gained worldwide attention and how the changes they made, ***pre-IPO***, to Velocity's underwriting practices, and the resulting riskier loans in its loan portfolio, put the Company at greater risk to market downturns – and not paint a rosy picture of a halcyon market in the face of those undisclosed risks.

### 3.    Defendants' Truth on the Market Defense Fails

"'[A] "truth-on-the-market" defense is available in principle . . . but not at the pleading stage.'" *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at \*4 (N.D. Cal. May 11, 2006); *see Provenz*, 102 F.3d at 1493 (noting that "defendants bear a heavy burden of proof" at ***summary judgment*** to prove their truth-on-the-market defense). Even if this were an appropriate stage to raise the truth-on-the-market

---

[13] *Novel Coronavirus-China*, World Health Organization (Jan. 12, 2020), https://www.who.int/csr/don/12-january-2020-novel-coronavirus-china/en/).

[14] *How Did Past Health Scares Affect the Real Estate Market*, WTOP News (Apr. 30, 2020), https://wtop.com/news/2020/04/how-did-past-health-scares-affect-the-real-estate-market/.

1  defense, Defendants' argument would fail.  Defendants argue that because Velocity

2  did not have any information about COVID that was not publicly available, they can

3  sidestep liability under §11.  Mtn. at 17-18.  However, "investors are not generally

4  required to look beyond a given document to discover what is true and what is not."

5  *Miller*, 519 F.3d at 887 (collecting citations for the proposition that investors are not

6  required or charged with independently seeking the truth outside of the offering

7  documents); *see Pirani*, 445 F. Supp. 3d at 387 ("That the [risk was] already publicly

8  available on Slack's website does not make its omission from the Offering Materials

9  less material.").[15]

10         **4.    Velocity Did Not Adequately Disclose COVID Risks**

11         Defendants argue that they adequately disclosed COVID risks by stating that

12  they disclosed the Company was subject to "'acts of God'" that could affect a

13  "'borrower's ability to repay the loan' and 'the risk of foreclosure.'"  Mtn. at 17-18.

14  However, these are the exact vague and boilerplate risk disclosures that Item 105

15  forbids.  *See Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12,

16  2019) ("[B]oilerplate risk factors do not satisfy the requirements set forth in item

17  [105]."); *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014)

18  (vague risk disclosures were insufficient to cure omissions).[16]  These vague risk

19  disclosures are not "'sufficient cautionary language . . . such that reasonable minds

20  could not disagree that the challenged statements [are] not misleading.'"  *In re Atossa*

21  *Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017).

22

23  [15]  Defendants' citations to *Rubke*, 551 F.3d at 1162-63, and *In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1097 n.14 (C.D. Cal. 2003), are unhelpful.  Unlike in each of those cases, the

24  information here is firm-specific because only Velocity could know that its underwriting practices and non-performing loans made a disease outbreak more problematic for Velocity than for other

25  lenders.

26  [16]  Defendants' citation to *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399 (9th Cir. 1996), is misplaced. In *Stac*, the complaint centered on omissions regarding competition and provided detailed

27  descriptions of these risks associated with its competition.  *Id.* at 1406.  These disclosures are far more specific than the vague warnings about "acts of God," provided by Defendants here which

28  could cover any unexpected event.

- 19 -

4834-6689-7619.v10

### D. The Complaint Adequately Alleges Control Person Liability

Section 15 of the 1933 Act imposes liability on those who control primary violators. *See* 15 U.S.C. §77o(a). In the Ninth Circuit, "[a]t the pleading stage, Plaintiffs must only show ***authority*** to exercise such power, ***rather than actual exercise*** of such power." *Hemmer Grp. v. Sw. Water Co.*, 527 F. App'x 623, 627 (9th Cir. 2013). The Complaint easily meets the standard. Lead Plaintiff alleges that the individual defendants signed or authorized the signing of the Registration Statement, which is sufficient to plead control.[17] *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 555 (N.D. Cal. 2009) ("[w]here a board member is alleged to have signed the registration statements at issue . . . courts have presumed that the director exercised actual authority and control"). Because Lead Plaintiff has adequately alleged a §11 violation, the Complaint accordingly adequately alleges a control person claim under §15.[18]

## IV. Conclusion

For the above reasons, Defendants' motion should be denied in its entirety.

DATED: November 30, 2020                    Respectfully submitted.

s/ Debra J. Wyman
DEBRA J. WYMAN

---

[17]   Defendants baldly assert that Pitstick and Schaefer were simply board nominees and thus had no control. Mtn. at 19 n.12. However, Schaefer was an operating partner of Snow Phipps Group, LLC, Velocity's controlling shareholder at the time of the IPO, which was entitled to nominate two directors to the post-IPO Board – Pitstick and Schaefer. These allegations sufficiently meet the low bar necessary to demonstrate the potential control required at the pleading stage. *AES Corp. v. Dow Chem. Co.*, 2001 WL 34367296, at *5 (D. Del. Jan. 19, 2001) ("Allegations that 'support a reasonable inference that [defendant] had the ***potential to influence*** and direct the activities of the primary violator' suffice to plead control person liability.").

[18]   Leave to amend should be granted with "extreme liberality," especially in securities cases. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-52 (9th Cir. 2003). Defendants state without support that leave to amend would be futile, and do not argue prejudice which carries the greatest weight in determining if amendment is permissible. *Id*. at 1052; Mtn. at 20. Lead Plaintiff has amended his Complaint once, and has faced only one motion to dismiss. These circumstances are insufficient to overcome the strong policy in favor of leave to amend.

- 20 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
debraw@rgrdlaw.com
bcochran@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

BRONSTEIN, GEWIRTZ &
  GROSSMAN, LLC
PERETZ BRONSTEIN
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com

*Additional Counsel for Plaintiff*

- 21 -

1

## CERTIFICATE OF SERVICE

2      I hereby certify under penalty of perjury that on November 30, 2020, I

3  authorized the electronic filing of the foregoing with the Clerk of the Court using the

4  CM/ECF system which will send notification of such filing to the e-mail addresses on

5  the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing

6  of the foregoing via the United States Postal Service to the non-CM/ECF participants

7  indicated on the attached Manual Notice List.

8                                    s/ Debra J. Wyman
                                     DEBRA J. WYMAN (190812)
9
                                     ROBBINS GELLER RUDMAN
10                                        & DOWD LLP
                                     655 West Broadway, Suite 1900
11                                   San Diego, CA  92101-8498
                                     Telephone:  619/231-1058
12                                   619/231-7423 (fax)

13                                   E-mail:  debraw@rgrdlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 2:20-cv-06780-RGK-PLA Edward A. Berg v. Velocity Financial, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Craig J. Bergman**
  craig.bergman@davispolk.com

- **Stephen Blake**
  sblake@stblaw.com,nanderson@stblaw.com

- **Brian Edward Cochran**
  bcochran@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Charles S. Duggan**
  charles.duggan@davispolk.com,ecf.ct.papers@davispolk.com

- **David G. Halm**
  david.halm@qpwblaw.com,liseth.gonzalez@qpwblaw.com

- **James G Kreissman**
  jkreissman@stblaw.com,sstrauss@stblaw.com,nanderson@stblaw.com,sblake@stblaw.com

- **Chet A Kronenberg**
  ckronenberg@stblaw.com,managingclerk@stblaw.com

- **Neal Alan Potischman**
  neal.potischman@davispolk.com,ecf.ct.papers@dpw.com,felicia.yu@dpw.com,angela.quach@dpw.com

- **Dana M. Seshens**
  dana.seshens@davispolk.com

- **David C Walton**
  davew@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com

- **Debra J Wyman**
  debraw@rgrdlaw.com,debraw@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`